# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ANDERSON R. DaSILVA,

        Plaintiff,

    v.                                     Case No. 14-CV-812

ROBERT RYMARKIEWICZ and
KRISTINE DeYOUNG,

        Defendants.

## ORDER

    Anderson DaSilva, a *pro se* plaintiff, filed a civil rights action pursuant to 42 U.S.C. § 1983 alleging that his civil rights were violated. Judge William E. Callahan, Jr. screened DaSilva's complaint pursuant to 28 U.S.C § 1915A(a) and allowed him to proceed with his claims that defendants Robert Rymarkiewicz and Kristine DeYoung were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment to the U.S. Constitution. Judge Callahan also allowed DaSilva to proceed on a medical negligence claim against DeYoung. The case was subsequently reassigned to this court, and in accordance with 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73(b) the parties all consented to the full jurisdiction of this court. The case is now before the

court on the parties' cross-motions for summary judgment. (ECF Nos. 48, 56.) For the reasons set forth below, the court grants the defendants' motion and denies DaSilva's motion.

## I. FACTS

The facts are primarily taken from "Defendants' Proposed Findings of Fact" (ECF No. 58) and "Defendants' Reply to Plaintiff's Response to Defendants' Proposed Findings of Fact" (ECF No. 73). DaSilva responded to only some of the defendants' proposed facts; those to which he did not respond are admitted for purposes of deciding summary judgment. See Civil Local Rule 56(b)(4). Additional facts are taken from DaSilva's sworn complaint (ECF No. 1), which the Seventh Circuit Court of Appeals has instructed district courts to construe as an affidavit at the summary judgment stage. *Ford v. Wilson*, 90 F.3d 245, 246-47 (7th Cir. 1996). The facts are undisputed unless noted otherwise.

In December 2013 DaSilva was confined at Waupun Correctional Institution (WCI). (ECF No. 58, ¶ 1.) Rymarkiewicz was employed as a supervising officer 1 (lieutenant) at WCI and DeYoung was employed as a nurse clinician 2 in the health services unit at WCI. (ECF No. 58, ¶¶ 2, 5.)

On December 24, 2013, at approximately 10:30 p.m., DaSilva's cellmate yelled to officers that there was an "emergency at cell K-2." (ECF No. 58, ¶ 14.) DaSilva, who states he had been feeling dizzy and nauseous since about 8:45 p.m., collapsed on his

way from his bed to the toilet in his cell. (ECF No. 1, ¶ 3.) When DaSilva came to, he realized that he was bleeding from the right side of his head and that his cellmate was calling for help. (ECF No. 1, ¶ 3.) When the first officer arrived, he called over the radio for first responders and a supervisor. (ECF No. 58, ¶ 17.) He also instructed the inmates to keep pressure on DaSilva's wound until the first responders arrived. (ECF No. 58, ¶ 17.)

Rymarkiewicz, along with the first responders, arrived at the cell. (ECF No. 58, ¶ 18.) Rymarkiewicz entered the cell and observed that the bleeding appeared to have stopped. (ECF No. 58, ¶¶ 19-20.) DaSilva was placed in mechanical restraints and walked down two flights of stairs from his cell to the officer station with no assistance. (ECF No. 58, ¶ 21; ECF No. 1, ¶ 6.)

While Rymarkiewicz was attending to DaSilva, DaSilva's cellmate inquired whether the officers would take pictures of DaSilva's head. (ECF No. 73 at ¶ 24.) According to Rymarkiewicz, he informed DaSilva that pictures were not necessary and that, generally, pictures are not taken unless injuries are inflicted by someone else, such as a cellmate, and evidence of an assault is needed. (ECF No. 58, ¶ 24.) According to DaSilva, Rymarkiewicz told him that he would take pictures and send him to the hospital/let him see the nurse only if DaSilva told him that his cellmate had inflicted the injury. (ECF No. 1, ¶ 9.) DaSilva states that Rymarkiewicz said, "Did he do that? I can't help you unless you tell me your celly did that to you. If you tell me your celly did that,

3

then I can take pictures and have the nurse see you." (ECF No. 1, ¶ 9.) DaSilva states that he responded, "No. I told you already, after med-time I felt funny." (ECF No. 1, ¶ 9.)

DaSilva states that Rymarkiewicz repeatedly told him that the on-call nurse and the ambulance were on their way. (ECF No. 1, ¶ 5.) Rymarkiewicz denies telling DaSilva that an ambulance was on the way; instead, he states that, while DaSilva's cell was being cleaned up, he called DeYoung, the on-call nurse, for a medical assessment. (ECF No. 58, ¶¶ 29, 40.) At about 10:30 p.m. Rymarkiewicz told DeYoung that DaSilva hit his head, the wound had been cleaned up, the bleeding was controlled, and DaSilva did not appear to need stiches. (ECF No. 58, ¶¶ 46-47; ECF No. 1, ¶ 5; ECF No. 48-1 at 1.) Rymarkiewicz also told DeYoung that DaSilva claimed he had passed out, that he had been vomiting most of the day, and that he had felt worse after taking his medicine. (ECF No. 58, ¶¶ 48-49.) Rymarkiewicz informed DeYoung that DaSilva was speaking and cooperating with officers and seemed "ok." (ECF No. 58, ¶ 56 .) DeYoung did not speak to DaSilva. (ECF No. 1, ¶ 7.)

Rymarkiewicz recalls DeYoung telling him to return DaSilva to his cell and that he would be evaluated by nursing staff in the morning. (ECF No. 58, ¶ 57.) DeYoung recalls telling Rymarkiewicz that she would come in to assess DaSilva but that it would take about thirty minutes for her to get there. (ECF No. 58, ¶ 58.) Both Rymarkiewicz and DeYoung recall DeYoung advising Rymarkiewicz to let her know if DaSilva did not

4

improve or if his condition worsened, and both attempted to find out what medication DaSilva was on. (ECF No. 58, ¶¶ 51-52, 59; ECF No. 1 ¶ 14.) DeYoung instructed Rymarkiewicz to have DaSilva lay down and to sip only clear fluids. (ECF No. 58, ¶ 59.)

DeYoung states that she did not instruct institution staff to take DaSilva to the emergency room at that time because, according to Rymarkiewicz, DaSilva was speaking, cooperative, and the bleeding was controlled and appeared to have stopped. (ECF No. 58, ¶ 65.) DeYoung states that she determined the best course of treatment was for her to go to the institution to assess DaSilva's medical condition. (ECF No. 58, ¶ 66.)

DaSilva states that Rymarkiewicz told him to go to the staff bathroom to clean the blood off his face, but he asked Rymarkiewicz if he could clean up in his cell later after he felt better. (ECF No. 1, ¶ 10.) Rymarkiewicz agreed, and after DaSilva's cell was cleaned up, DaSilva was escorted by staff back to his cell, per DeYoung's instructions. (ECF No. 1, ¶ 10 ; ECF No. 58, ¶ 67.)

According to DaSilva, once back in his cell, he became increasingly dizzy and nauseous and had to sit down; within minutes he began to vomit and his head wound began to bleed again. (ECF No. 1, ¶ 11.) At about 11:05 p.m., officers again heard yelling from DaSilva's cell. (ECF No. 58, ¶ 72.) DaSilva told officers that he got up to vomit and his head began to bleed again. (ECF No. 58, ¶ 73.) Rymarkiewicz returned to DaSilva's cell and told officers to contact control to have them call the nurse. (ECF No. 58, ¶ 75.) At 11:30 p.m. Rymarkiewicz again spoke with DeYoung (still at home, having not yet left

to go in to WCI) and told her that DaSilva claimed to have blacked out again. (ECF No. 58, ¶ 76.) DeYoung asked to speak to DaSilva; she waited for several minutes but then was told that he spoke mostly Spanish. (ECF No. 58, ¶ 77.)

Rymarkiewicz recommended to DeYoung that DaSilva either be evaluated by nursing staff or sent to Waupun Memorial Hospital Emergency Room. (ECF No. 58, ¶ 80.) DeYoung agreed that DaSilva should be sent to the hospital because his condition was continuing and they were closer to the hospital than she was to WCI. (ECF No. 58, ¶¶ 81, 95.) She also told Rymarkiewicz that DaSilva could be transported by state car instead of ambulance if he seemed stable. (ECF No. 58, ¶ 81.) DaSilva, like all inmates who leave the institution, was strip searched and put in restraints before he was taken to the emergency room in a state vehicle. (ECF No. 58, ¶¶ 83, 84; ECF No. 1, ¶ 15.)

DaSilva states that he arrived at the hospital at about 12:07 a.m., one and a half hours after he initially cut his head. (ECF No. 1, ¶ 15.) The emergency room treating staff found that DaSilva exhibited no acute distress and that he had a one centimeter long laceration, along with a surrounding contusion, on the right side of his head and face. (ECF No. 58, ¶ 85.) They noted that the cut was not actively bleeding and that DaSilva exhibited normal sensory, motor, and speech and that he was alert and oriented to person, place, time, and situation. (ECF No. 58, ¶¶ 85-87.) The emergency room staff diagnosed DaSilva with a concussion without loss of consciousness and a laceration, and

6

they closed his wound with two staples. (ECF No. 58, ¶¶ 88, 90.) By 1:15 a.m., DaSilva was back in his cell. (ECF No. 58, ¶ 92.)

## II.  SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal

7
Case 2:14-cv-00812-WED   Filed 12/08/15   Page 7 of 16   Document 76

knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

## III. ANALYSIS

As an initial matter, the court denies the defendants' motion to strike DaSilva's motion for summary judgment. (ECF No. 63.) The defendants raise the same arguments that they set forth in their motion to strike in their response to DaSilva's summary judgment motion. (ECF No. 57, at 1, n.1.) Civil Local Rule 56(b)(9) (E.D. Wis.) states that "collateral motions, such as motions to strike, are disfavored." The defendants' arguments will be addressed in the context of the parties' summary judgment motions.

With regard to those arguments, the court notes that, upon screening DaSilva's complaint, Judge Callahan ordered that DaSilva could proceed only with his claims that Rymarkiewicz and DeYoung were deliberately indifferent to his head wound and that DeYoung was medically negligent in her treatment of DaSilva's head wound. (ECF No. 23 at 6-8.) Judge Callahan specifically dismissed the remaining negligence claims DaSilva raised in his complaint. (*Id*. at 8.) As such, the court will disregard the arguments in DaSilva's brief on any state law negligence claim other than the medical malpractice claim. (See ECF No. 48 at 8-12; 13-14; 18-21.)

A. <u>Standard for Deliberate Indifference to Serious Medical Needs</u>

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when their conduct demonstrates 'deliberate indifference to serious

8

Case 2:14-cv-00812-WED   Filed 12/08/15   Page 8 of 16   Document 76

medical needs of prisoners.'" *Gutierrez v. Peters*, 111 F.3d 1364, 1369 (7th Cir. 1997). This standard contains both an objective element (i.e., that the medical need be sufficiently serious) and a subjective element (i.e., that the officials act with a sufficiently culpable state of mind). *Id.*

The defendants concede for purposes of summary judgment that DaSilva suffered an objectively serious injury. (ECF No. 57 at 10.) Thus, the only issue is whether the defendants were deliberately indifferent to DaSilva's condition—that is, whether Rymarkiewicz and DeYoung knew of and disregarded an excessive risk to DaSilva's health. See *id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). This is a high standard; medical malpractice is insufficient, as is a mere disagreement with a medical professional's medical judgment. See *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011). "A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, 'no minimally competent professional would have so responded under those circumstances.'" *Arnett*, 658 F.3d at 751 (quoting *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011)).

B. <u>Rymarkiewicz Was Not Deliberately Indifferent to DaSilva's Head Wound</u>

DaSilva cannot show that Rymarkiewicz was deliberately indifferent to his head wound. Shortly after receiving notice that DaSilva had a laceration on his head,

Rymarkiewicz called DeYoung, the on-call nurse. He relayed to DeYoung his observations, including that DaSilva was talking to officers, moving under his own power and cooperative, and that the wound seemed to have stopped bleeding. Rymarkiewicz also informed DeYoung that DaSilva had felt nauseous and dizzy that day, with symptoms worsening after he took his meds.

Rymarkiewicz followed DeYoung's instructions to place DaSilva back in his cell and to have him lie down and sip clear liquids. Rymarkiewicz was entitled to defer to DeYoung's judgment as long as he did not ignore DaSilva and as long as he did not have actual knowledge that DeYoung was mistreating DaSilva. See *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012); see *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("…cases make clear, the law encourages non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability for doing so."). Rymarkiewicz neither ignored DaSilva nor had actual knowledge that DeYoung was mistreating DaSilva. Rymarkiewicz was prompt and thorough in his conversation with DeYoung, and, based on the fact that DaSilva was talking, moving around and cooperative and that his wound had stopped bleeding, Rymarkiewicz had no reason to know that DeYoung's instructions were inappropriate.

Further, shortly after learning that DaSilva had once again thrown up and that his head wound had resumed bleeding, Rymarkiewicz called DeYoung for a second

10

time and suggested that DaSilva either be seen by nursing staff or transported to the hospital. Rymarkiewicz then arranged for DaSilva to be transported to the emergency room. All of this occurred within an hour and a half from when Rymarkiewicz first learned of DaSilva's injury.

Rymarkiewicz's actions establish that he was not deliberately indifferent to DaSilva's serious medical needs. He acted promptly and conveyed relevant and complete information to DeYoung. He then followed her instructions and immediately contacted her again when DaSilva continued to experience symptoms. The court concludes that Rymarkiewicz did not disregard an excessive risk to DaSilva's health, and therefore, grants his motion for summary judgment.

C. DeYoung Was Not Deliberately Indifferent to DaSilva's Head Wound

Similarly, DeYoung's actions do not indicate that she was deliberately indifferent to DaSilva's medical needs. DeYoung received a call at 10:30 p.m. with a report that DaSilva had fallen and cut his head, though it appeared that the wound was no longer bleeding. Rymarkiewicz informed her that DaSilva was talking to officers, cooperative, and moving under his own power. He also told her that the small laceration did not appear to need stiches.

Based on that information, DeYoung concluded that DaSilva should lay down in his cell and sip clear liquids until he could be assessed by nursing staff. She instructed Rymarkiewicz to call her if DaSilva's condition did not improve or if it worsened. After

11

she received the second call an hour later, she asked to speak to DaSilva, and when told that DaSilva spoke mostly Spanish, she instructed Rymarkiewicz to transport DaSilva to the hospital because it was closer to the institution than she was.

The standard for deliberate indifference is different for DeYoung, a medical official, than it is for Rymarkiewicz, a prison guard. For DeYoung's treatment to be characterized as deliberately indifferent, it must have been "so far out of bounds that it was blatantly inappropriate or not even based on medical judgment." *King v. Kramer*, 680 F.3d 1018, 1019 (7th Cir. 2012).

DaSilva argues that DeYoung's delay in instructing that he be transported to the hospital upon first learning of his head wound demonstrates her deliberate indifference. It is true that "the receipt of some medical care does not automatically defeat a claim of deliberate indifference" and that deliberate indifference exists when a medical official "delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015). However, DeYoung was told by Rymarkiewicz that DaSilva appeared to be "ok," that he was no longer bleeding, and that he was walking around and talking to officers. Based on this information, her instructions to observe DaSilva until he could be assessed by a nurse do not indicate a deliberate indifference to his medical needs. See *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006 ("It is not enough to show, for instance, that a doctor should have known that surgery was necessary; rather, the doctor must know that

12
Case 2:14-cv-00812-WED    Filed 12/08/15    Page 12 of 16    Document 76

surgery was necessary and then consciously disregard that need in order to be held deliberately indifferent.").

Further, as soon as DeYoung learned that DaSilva's condition had not improved, she ordered that the institution transport DaSilva to the hospital emergency room. All of this occurred within an hour and a half of the initial fall, a period of time that the Seventh Circuit Court of Appeals has indicated is unlikely to give rise to a constitutional violation. See *Murphy v. Walker*, 51 F.3d 714, 717 (7th Cir. 1995) (holding that "two hours does not seem like an unreasonably long wait to x-ray, examine, and possibly cast a fractured extremity . . . .").

In any event, DaSilva has not set forth any medical evidence to establish that this delay had any detrimental effect on him, which is fatal to his claim. *Langston v. Peters*, 100 F.3d 1235, 1241 (7th Cir. 1996) (holding that "[a]n inmate who complains that delay in medical treatment rose to a constitutional violation must place *verifying medical evidence* in the record to establish the detrimental effect of delay in medical treatment to succeed.") (emphasis in original). Once at the hospital, the treating staff found that DaSilva exhibited no acute distress, that he was alert, and that he had normal sensory, motor, and speech. (ECF No. 58 ¶¶86-87.) He was diagnosed with a concussion without loss of consciousness and a laceration, which was cleaned and closed with two staples. (Id ¶¶ 89, 90.) As such, DaSilva has not established that the one and one-half hour delay had any detrimental effect on him.

DaSilva also makes much of the fact that DeYoung did not speak directly to him during the first call, as Department of Corrections policy requires, but instead relied on the assessment of Rymarkiewicz. However, violation of internal rules or policies does not on its own create a constitutional violation. See *Vance v. Peters*, 97 F.3d 987, 995 (7th Cir. 1996) (citing *McGill v. Duckworth*, 944 F.2d 344, 350 (7th Cir. 1991) (noting the distinction between an officer's violation of a prison rule and of an Eighth Amendment requirement)); see also *Gayton v. McCoy*, 593 F.3d 610, 622-23 (7th Cir. 2010) (finding that nurse who failed to follow internal policy was not deliberately indifferent because she took reasonable measures to address the inmate's medical needs). DeYoung had sufficient information from Rymarkiewicz to make her decision on how to treat DaSilva's medical needs.

Because DeYoung was not deliberately indifferent to DaSilva's medical needs, the court grants summary judgment on this claim in her favor.

D. <u>Medical Malpractice Claim</u>

Under Wisconsin law, it is well established that medical malpractice claims, which are a subset of negligence claims, require expert testimony to establish the standard of care unless the situation is one where the common knowledge of laymen affords a basis for finding negligence. *Carney-Hayes v. NW. Wis. Home Care, Inc.*, 2005 WI 118, ¶ 37, 284 Wis.2d 56 (citations omitted); *Jeckell v. Burnside*, 2010 WI App 71, ¶ 10, 325 Wis.2d 401 (unpublished). Courts require expert testimony in connection with medical

malpractice claims to establish the accepted degree of skill, care, and judgment required of a reasonable medical professional in a given situation. *Jeckell*, 2010 WI App 71 at ¶ 10. DaSilva does not dispute that Wisconsin requires expert testimony to establish the standard of care, but he does not submit expert testimony to support his medical malpractice claim. Therefore, the court must dismiss his medical malpractice claim against DeYoung.

As an aside, the fact that DeYoung may have violated Department of Corrections policy by not speaking directly to DaSilva does not automatically mean that DeYoung violated the relevant standard of care for treating DaSilva's injuries. Regulations adopted by a private organization do not set the standard of care; the law sets the standard of care. See *Estate of Brown v. Physicians Plus Ins. Co. of Wis., Inc.*, 332 Wis.2d 316, ¶ 15 (Ct. App. 2011).

**WHEREFORE, IT IS HEREBY ORDERED** that the defendants' motion to strike the plaintiff's summary judgment motion (ECF No. 63) is **DENIED**.

**IT IS FURTHER ORDERED** that the defendants' motion for summary judgment (ECF No. 56) is **GRANTED**.

**IT IS ALSO ORDERED** that the plaintiff's motion for summary judgment (ECF No. 48) is **DENIED**.

**IT IS FURTHER ORDERED** that the Clerk of Court **DISMISS** this action and enter judgment accordingly.

15

Case 2:14-cv-00812-WED   Filed 12/08/15   Page 15 of 16   Document 76

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. *See* Federal Rule of Appellate Procedure 3, 4. This court may extend the deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. *See* Federal Rule of Civil Procedure 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin this 8th day of December, 2015.

_____
WILLIAM E. DUFFIN
U.S. Magistrate Judge

16
Case 2:14-cv-00812-WED   Filed 12/08/15   Page 16 of 16   Document 76